**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


**ROBERT HAYES,**

      **Plaintiff,**

**vs.**                        **Case No. 4:10cv541-MP/CAS**

**SECRETARY, FLORIDA DEPARTMENT**
**OF CHILDREN AND FAMILIES,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

The pro se Plaintiff filed a second amended complaint, doc. 16, which was served on the Defendant. After the denial, docs. 25 and 29, of Defendant's motion to dismiss for failure to state a claim, doc. 21, the parties were given an opportunity to conduct discovery. Doc. 35. At the conclusion of that period, Defendant filed a motion for summary judgment, doc. 43, supported by an additional filing, doc. 44, containing Defendant's Exhibit C which was cited in the summary judgment motion. Plaintiff has filed his response, doc. 49, in opposition to Defendant's motion for summary judgment. That motion is ready for a ruling and is addressed in this report and recommendation.

During the period in which the summary judgment motion was pending, Plaintiff file a motion for temporary restraining order and preliminary injunction, doc. 49, supported by a memorandum of law, doc. 50. Defendant was given an enlargement of

time in which to respond, docs. 53-54, but Defendant has not filed a response to

Plaintiff's motion.  The motion for summary judgment will be reviewed first, and then

only if that motion is denied will there be a need to consider Plaintiff's motion.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendant initially has the burden to

demonstrate an absence of evidence to support the nonmoving party's case.  Celotex

Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d

265 (1986).  If accomplished, the burden shifts to Plaintiff to come forward with

evidentiary material demonstrating a genuine issue of material fact for trial.  *Id*.  An

issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v.

Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).

Plaintiff must show more than the existence of a "metaphysical doubt" regarding the

material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475

U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of

evidence is insufficient.  The Court must decide "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260, *quoting*

Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202

(1986).  All reasonable inferences must be resolved in the light most favorable to the

nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if

there is a genuine dispute as to those facts. Scott v. Harris, 550 U.S. 372, 380, 127

S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* Ricci v. DeStefano, 129 S.Ct. 2658, 2677

(2009).  "Where the record taken as a whole could not lead a rational trier of fact to find

for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Industrial

Co., 475 U.S. at 587 (internal quotation marks omitted), *quoted in* Ricci v. DeStefano,

129 S.Ct. at 2677.

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by

her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v.

Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting*

Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The

nonmoving party need not produce evidence in a form that would be admissible as Rule

56(e) permits opposition to a summary judgment motion by any of the kinds of

evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex,

477 U.S. at 324, 106 S. Ct. at 2553.

**Background Facts and Allegations of the Complaint, doc. 16**

Plaintiff has been involuntarily civilly committed pursuant to the Jimmy Ryce Act[1]

and has been a resident at the Florida Civil Commitment Center (FCCC) in Arcadia,

Florida for approximately twelve years.  Doc. 16 at 2, 4; doc. 43 at 5.  Defendant in this

case is the Secretary of the Florida Department of Children and Families (hereinafter

"DCF").  Pursuant to contractual authority provided in FLA. STAT. § 394.9151,[2] DCF

---

[1] Plaintiff alleged that the statutory authority for the Jimmy Ryce Act and its related proceedings is found at FLA. STAT. § 394.910 - 394.931.  Doc. 16 at 2.

[2] That statute provides, in relevant part: "The Department of Children and Family Services may contract with a private entity or state agency for use of and operation of facilities to comply with the requirements of this act."

contracts with Geo Care, LLC, (hereinafter "Geo")[3] for the operation of FCCC. Doc. 16 at 2; doc. 43 at 5.

Plaintiff's complaint, doc. 16, alleges that in enacting the Jimmy Ryce Act (FLA. STAT. § 394.910-394.932), the Florida Legislature did not "include a provision allowing DCF to promulgate rules for the operation of the FCCC pursuant to" FLA. STAT. § 120.54. Doc. 16 at 2. Plaintiff claims that because there are no rules governing the FCCC, residents like Plaintiff are subject to punishment without notice and to the "arbitrary and capricious" decisions of Geo employees.[4] *Id.* at 2-4. Plaintiff alleged that "[e]very employee of Geo is in effect his or her own rulemaking authority." *Id.* at 4. Plaintiff claims that the lack of promulgated rules violates his due process rights as guaranteed by the Fourteenth Amendment. *Id.* at 5. As relief, Plaintiff seeks a declaratory judgment that all the provisions of Florida's Involuntary Civil Commitment of Sexually Violent Predators Act (commonly known as the Jimmy Ryce Act), FLA. STAT. § 394.910-394.931, be declared unconstitutional. *Id.*

Defendant advises that pursuant to FLA. STAT. § 394.930, DCF is mandated to adopt certain rules[5] for:

---

[3] Defendant identifies this organization as "GEO Care LLC," doc. 43, Ex. A. Plaintiff, on the other hand, references this as "GEO Group, Inc.," doc. 16 at 2. The front cover of the Resident Handbook, doc. 43, Ex. B, indicates it is a publication of "The GEO Group, Inc.," of which Tim Budz is identified as the Facility Administrator. Doc. 43, Ex. B (doc. 43-2).

[4] To support the claim that staff create their own rules and show how Plaintiff is subjected to arbitrary and capricious decisions, Plaintiff submitted six examples of incidents at FCCC. Doc. 16 at 2-4.

[5] None of the six categories of rules set forth in § 394.930 relates to the rights of residents, conduct of residents, or disciplinary procedures and punishment. *Cf.* FLA. STAT. § 944.09 (statute granting Department of Corrections authority to adopt rules).

(1) Procedures that must be followed by members of the multidisciplinary teams when assessing and evaluating persons subject to this part;

(2) Education and training requirements for members of the multidisciplinary teams and professionals who assess and evaluate persons under this part;

(3) The criteria that must exist in order for a multidisciplinary team to recommend to a state attorney that a petition should be filed to involuntarily commit a person under this part. The criteria shall include, but are not limited to, whether:

 (a) The person has a propensity to engage in future acts of sexual violence;

 (b) The person should be placed in a secure, residential facility; and

 (c) The person needs long-term treatment and care.

(4) The designation of secure facilities for sexually violent predators who are subject to involuntary commitment under this part;

(5) The components of the basic treatment plan for all committed persons under this part;

(6) The protocol to inform a person that he or she is being examined to determine whether he or she is a sexually violent predator under this part.

FLA. STAT. § 394.930.  DCF concedes "[t]here is no authority given for any other type of rule to be promulgated by the Department of Children and Family Services regulating the FCCC."  Doc. 43 at 5-6.  Furthermore, it has been noted that § 394.930 grants DCF "sole authority to adopt rules to give effect to the provisions of the Jimmy Ryce Act." Myers v. Fla. Civil Commitment Ctr., 953 So.2d 726, 727 (Fla. 1st DCA 2007).

**Rule 56 Evidence**

 Defendant has provided the affidavit of Daniel Montaldi, the Administrator of the Sexually Violent Predator Program at DCF, who avers that DCF "has not promulgated rules under the Florida Administrative Procedures Act related to daily operations at FCCC."  Defendant's Ex. C (hereinafter Montaldi Affidavit at 1 (doc. 44-1).  Montaldi

asserts that DCF "does not have statutory authority necessary to adopt such rules."

Defendant's Ex. C; Montaldi Affidavit at 1, *citing* FLA. STAT. § 394.930.  Moreover,

Montaldi contends that "FCCC is not an 'agency' within the meaning of section 120.52,[6]

Florida Statutes, for which rules must be promulgated."  *Id.*

    Defendant further contends that even though governing rules for the "FCCC are

not promulgated under the Florida Administrative Code, FCCC is not without policies

and procedures governing daily life at FCCC."  Doc. 43 at 6; Ex. A (hereinafter "Budz

Affidavit").  Defendant submits that "[m]any policies and procedures governing resident

behavior are found in the Resident Handbook[7] ("Handbook"), which is provided to each

resident at FCCC upon commitment to the facility."  Doc. 43 at 6; *see also* Budz

Affidavit at 1.  "When the Handbook is updated, the new version is also provided to all

residents."  Budz Affidavit at 1.  As explained in the first page of the Handbook, "[t]he

purpose of [the Handbook] is to provide [residents] with answers to the most common

---

    [6] Section 120.52(1) defines "Agency" as:

    (a) The Governor; each state officer and state department, and each departmental unit described in s. 20.04; the Board of Governors of the State University System; the Commission on Ethics; the Fish and Wildlife Conservation Commission; a regional water supply authority; a regional planning agency; a multicounty special district, but only when a majority of its governing board is comprised of nonelected persons; educational units; and each entity described in chapters 163, 373, 380, and 582 and s. 186.504.
    (b) Each officer and governmental entity in the state having statewide jurisdiction or jurisdiction in more than one county.
    (c) Each officer and governmental entity in the state having jurisdiction in one county or less than one county, to the extent they are expressly made subject to this act by general or special law or existing judicial decisions.

FLA. STAT. § 120.52.  The remainder of the statute provides exclusions to the definition, but does not include entities created under chapter 394.

    [7] The Handbook has been submitted as Defendant's Exhibit B.  Doc. 43-2.

questions raised by residents at FCCC."  Doc. 43, Ex. B (doc. 43-2 at 2).  Timothy

Budz, the Facility Administrator, provides a list in his affidavit of the contents of the

Handbook:

> [T]he Handbook contains a list of resident rights and responsibilities, information
> on health services, information on the resident grievance procedure, information
> on resident communications, information on resident review of records, and
> information on public records requests.  In addition, the Handbook includes the
> daily schedule for FCCC, rules for how to maintain resident living quarters, and
> information on when residents can access showers, laundry facilities, recreation,
> and the library.  The Handbook also outlines the resident dress code and
> hygiene standards, as well as count procedures.  In addition, the Handbook
> provides guidelines on appropriate resident behavior and outlines the 5 privilege
> levels at FCCC.  The Handbook contains a list of items considered contraband, a
> list of rule violations with the range of sanctions for each offense, and a list of
> approved property.  The Handbook also contains information on resident mail,
> computer access, and religious services.  Visitation procedures are also
> provided.  Finally, the Handbook explains the treatment program offered at
> FCCC.

Budz Affidavit at 1-2 (doc. 43-1); *see also* Handbook (Ex. B, doc. 43-2).  Budz states

that FCCC is also governed by a Behavior Management and Intervention Policy[8] (PRG-

11)" which provides "written detailed policies on a range of topics, including resident

behavior, disciplinary procedures, security measures, health care and count

procedures."  Budz Affidavit at 2 (doc. 43-1).  Budz advises that FCCC policies are

divided into restricted and unrestricted categories, although no explanation is provided

as to how that determination is made other than stating that residents can review all

policies "with the exception of those that are restricted for security reasons."  Budz

Affidavit at 2 (doc. 43-1).  Residents are able to review all unrestricted policies "on the

computers in the resident computer lab" and also by submission of a public records

request.  Budz Affidavit at 2 (doc. 43-1).

---

[8] A copy of PRG-11 is provided as Defendant's Exhibit D.  Doc. 43-3.

The Behavior Management and Intervention Policy (PRG-11), with an effective date of December 12, 2012, has been provided as Defendant's Exhibit D.  Doc. 43-3. The stated purpose of this "policy is to provide a process to maintain a safe and orderly environment for residents and staff by establishing facility rules and guidelines to reflect what behavior is expected from the resident population."  Ex. D (doc. 43-3).  PRG-11 provides a system "to manage resident behavior by imposing corrective measures on those residents whose behavior is not in compliance with facility rules while offering additional privileges to residents who maintain appropriate behavior."  *Id.* at 1.

Budz states that as the Handbook is periodically updated, new copies are provided to the residents.  Budz Affidavit at 2 (doc. 43-1).  "FCCC administration also issues written updates or memos to supplement the Handbook as necessary" which are also provided to residents  *Id.*  If a resident has a question that he feels is not answered in the Handbook, or if a conflict or inconsistency is noticed, the "resident may submit a resident communication to FCCC staff in order to resolve the issue."  Budz Affidavit at 2 (doc. 43-1).  "Similarly, if a resident has an issue or question that he feels is not answered in the Handbook or FCCC policies, the resident may submit a resident communication to FCCC staff in order to resolve the issue."  *Id.*  In addition, Defendant has provided a copy of the Resident Grievance Procedure (referred to as PRG-14) which permits residents "to seek formal review of an issue relating to any aspect of his civil commitment."  Defendant's Exhibit E (doc. 43-4 at 1).

Defendant has provided evidence that DCF "monitors the performance of contracted services at FCCC, but the Department does not specifically approve each operating procedure in the Handbook or in the Policy and Procedure Manual."  Montaldi

Affidavit at 2 (doc. 44-1). "FCCC periodically provides the Department a copy of the Handbook and the Department can provide input[9] to FCCC on its content." *Id.*

In addition to the "Behavior Management and Intervention Policy (PRG-11)" identified in the Budz Affidavit, (doc. 43-1 at 2), Montaldi states that "FCCC also has a Policy and Procedure Manual, which contains a large number of detailed policies on a range of topics from discipline to security measures." Montaldi Affidavit at 2 (doc. 44-1). The Policy and Procedure Manual is "generally" provided to DCF for review annually. *Id.* While DCF "can provide input" on FCCC's policies, DCF "does not specifically review and sign off on every policy FCCC adopts." *Id.* "However, if FCCC administration is changing a major policy, such as PRG-11 (Behavior Management Policy) or if changes are being made in direct response to litigation, the Department is generally included in those decisions and will provide input, if warranted." *Id.*

Plaintiff has submitted eleven affidavits from other residents at FCCC as evidence in support of his claim that residents are subjected to the arbitrary and capricious whims of staff. Doc. 48, Exhibits A-K (doc. 48 at 12-23). The affidavit of Marvin Armstrong states that in April of 2010, a "staff member entered the dorm yelling 'code red.' " Doc. 48 at 12, Ex. A. Armstrong reports that no resident knew what was meant by "code red" and that nothing in the Resident Handbook explained that term. *Id.* As punishment for not complying with the "code red," which was belatedly explained as a fire drill requiring residents to leave the dorm, "the incoming phone line to Jupiter Dorm was disconnected for three (3) weeks, thereby precluding residents from

---

[9] The most recent copy of the Handbook was revised June 1, 2012. DCF did not provide any input concerning the revision. Montaldi Affidavit at 2 (doc. 44-1).

receiving calls from the family and friends in the outside world." *Id.* Armstrong also states that no resident was provided a Behavior Management hearing "as defined in PRG-11 prior to being punished by having phone privileges suspended for three weeks." *Id.*

The affidavit of Gary Burton states that in October of 2009, residents were "strongly urged" to purchase "large capacity digital storage devices so as to scan and store legal and treatment documentation; as well as to store music and games in digital form as an alternative to compact discs and tapes." Doc. 48 at 13, Ex. B. Burton purchased a 260 gigabyte external hard drive in November of 2009. *Id.* However, in May of 2010, Burton's "external hard drive was confiscated by Florida Civil Commitment Center staff as being contraband." *Id.* "No reason was ever given as to why the device was deemed to be contraband" and Burton has never regained possession of it. *Id.*

Likewise, Mark Phillips submitted an affidavit in which he states that in 2009, he had "received permission to receive $145.00 of electrical cables and routers for use with affiant's television and gaming system." Doc. 48 at 20, Ex. H. "This property arrived via package and was allowed in by FCCC staff." *Id.* However, in March of 2010, he was subjected to a random search and his electrical equipment was confiscated by staff who "felt affiant should not possess such property." *Id.* Phillips was never permitted "to regain possession of his property." *Id.*

A similar affidavit from Richard Wean states that approximately four years ago, he "received permission from staff . . . .to receive an electronic splitter device for his television cable, as well as a flashlight in a package." Doc. 48 at 21, Ex. I. Wean's mother purchased the items and they were "allowed into the facility." *Id.* In December

of 2011, however, FCCC staff "confiscated the electronic splitter device and flashlight as being contraband." *Id.* In addition, in August of 2011, Wean received approval for a large drinking cup, but after his mother purchased the cup and it was mailed to FCCC, staff refused to allow Wean to receive the cup and it was confiscated as contraband. *Id.*

Kenneth Widel also submitted an affidavit and stated that he was given permission three years ago to obtain a coaxial cable "to link his television antenna and television." Doc. 48 at 22, Ex. J. He received the cable and utilized it for several years, however, on "October 24, 2012, with no change in the Florida Civil Commitment Center rulebook, or even notice via memorandum, security staff at the Florida Civil Commitment Center seized Affiant's cable as 'contraband.'" *Id.*

The affidavit of Ralph Flint states that on August 6, 2012, Flint submitted a grievance pursuant to policy and procedure. Doc. 48 at 14, Ex. C. As of October 1, 2012, Flint had not received a response to that grievance, and he avers that he is unable to compel a response. *Id.* Flint contends that without a response, he is unable to file a habeas petition challenging disciplinary proceedings as he would not have exhausted administrative remedies. *Id.* Similarly, Donald McKee's affidavit also states that he has attempted to seek information and file grievances at FCCC, but on "a number of occasions" (the date of which is not provided) he has not received a response. Doc. 48 at 18, Ex. F.

Brian Gelish submitted an affidavit stating that "FCCC has a purported 'policy' that during the course of random security searches of resident personal property staff are not to read residents legal mail." Doc. 48 at 16, Ex. D. Gelish states that when he

was searched on August 9, 2012, a search that lasted for "over one hour," staff read his "legal work in detail." *Id.* Gelish reports that this incident was not the only time such activity occurred. *Id.*

An affidavit by Ericross Sander Haid states that he was also subjected to a random search of his property on March 30, 2012. Doc. 48 at 17, Ex. E. During that search, Haid's "confidential correspondence with legal counsel was read by staff," as were confidential medical documents. *Id.* Haid reports that after the search, some documents he had obtained via a public records request were confiscated, along with his "address book, and electronic storage device containing confidential legal work." *Id.*

James Pesci states in his affidavit that although the Resident Handbook states that residents "have a right to 'speak and express oneself in writing,'" he attempted to disseminate a newsletter called "Duck Soup" but was shut down. Doc. 48 at 19, Ex. G. Pesci states that his publication was critical of staff at FCCC, but he "never advocated violence or used profanity." *Id.* Nevertheless, the Director of FCCC "unilaterally determined Duck Soup to be contraband and stated that possession of this newsletter by either staff or residents would cause such individuals to be held accountable, thereby essentially shutting down publication of the Duck Soup newsletter." *Id.*

The final affidavit submitted by Plaintiff is a second affidavit from Donald McKee. Doc. 48 at 23, Ex. K. He states that after a mentally ill resident destroyed shower curtains in the Paris Dorm with a razor blade, a memorandum was posted[10] by the Assistant Facility Administrator informing "the 40 residents of Paris Dorm that they would lose their incoming phone privileges for 30 days." *Id.* "No Behavior Management

---

[10] The date of that posting and loss of privileges is not provided. Doc. 48, Ex. K.

Hearing as defined in PRG-ll was held for any resident in Paris Dorm prior to the issuance of the aforementioned memorandum." *Id.*

**Analysis**

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives "any person of life, liberty, or property, without due process of law ." U.S. CONST. amend. XIV. To allege a violation of one's due process rights, a plaintiff must establish that he was deprived of an interest cognizable under the Due Process Clause, and that the procedures attendant upon that deprivation were not constitutionally sufficient. Kentucky v. Dep't of Corrections v. Thompson, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506. 459-60, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); Board of Regents v. Roth, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "Due process entitles an individual to notice and some form of hearing before state action may finally deprive him or her of a property interest" or liberty interest. Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994), *citing* Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 901-902, 47 L.Ed.2d 18 (1976). Further, the starting point for analysis in this case must recognize that Plaintiff is not a "prisoner," Newsome v. GEO Group, Inc., 82 So.3d 1067, 1069 (Fla. 4th DCA, 2011), and he is not held in punitive confinement. Kansas v. Hendricks, 521 U.S. 346, 362-69, 117 S.Ct. 2072, 2082-85, 138 L.Ed.2d 501 (1997); Seling v. Young, 531 U.S. 250, 261-262, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001); State v. Harris, 881 So.2d 1079, 1084–85 (Fla. 2004) (explaining that the involuntary civil commitment of sexually violent predators under the Jimmy Ryce Act is not punishment).

Defendant contends summary judgment is appropriate because Plaintiff's due process claim is "strictly a state law claim." Doc. 43 at 13. Defendant argues that "[t]here is no constitutional requirement for the Department to promulgate rules under Chapter 120, Florida Statutes." *Id.* Defendant asserts that under Youngberg v. Romeo, 457 U.S. 307, 322-24, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the superintendent "of an involuntary civil commitment facility is constitutionally empowered to implement policies and procedures to ensure the safe and secure facility operation, so long as those policies and procedures reflect the reasonable application of professional judgment." *Id.* at 13-14.

It is well established that § 1983 "does not create a remedy for every wrong committed under the color of state law, but only for those that deprive a plaintiff of a federal right." Knight v. Jacobson, 300 F.3d 1272, 1275 (11th Cir. 2002), *quoted in* March v. Dep't of Children and Families, No. 2:03CV162, 2006 WL 2644917 (M.D. Fla. Sept. 14, 2006). It is also well settled that a violation of state law does "not give rise to a viable substantive due process claim." Lovins v. Lee, 53 F.3d 1208, 1211 (11th Cir. 1995) (citing Collins v. City of Harker Heights, Texas, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)); *see also* Dean v. Escambia Cnty., No. 3:05cv29/LAC/MD, 2005 WL 927387 (N.D. Fla. Apr. 20, 2005) (holding that "[a]n alleged violation of a state statute does not give rise to a corresponding § 1983 violation, unless the right encompassed in the state statute is guaranteed under the United States Constitution."). McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994).

Plaintiff's claim in this case is based, partially at least, on the expanding argument that Florida law requires rules to be promulgated pursuant to FLA. STAT.

§ 120.54, and because DCF lacks authority to promulgate rules concerning the day to day operations of civil commitment centers and, indeed, has <u>not</u> promulgated any such rules, it necessarily follows that "the FCCC is operated without rules under Florida law" and that constitutes a due process violation. Doc. 16 at 2. That claim is foreclosed by well established law. DCF's failure to promulgate a rule concerning the daily operations of FCCC does not violate any right under the federal Constitution. Put another way, Plaintiff does not have a constitutional right to the promulgation of a rule under chapter 120, although Plaintiff does have a protected due process right which requires prior notice, or "fair warning," of proscribed conduct before a sanction may be imposed. <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972).

Pursuing Plaintiff's claim further, the amended complaint alleged that GEO, which operates FCCC, has engaged in its own rule making, but contends those rules are not "promulgated under Florida law." Doc. 16 at 4. Plaintiff argues that "[i]t is rulemaking by memorandum, today this, tomorrow that." *Id.* As noted above, a claim that rules are not promulgated pursuant to Florida law is not a federal due process claim.

Defendant further claims that if Plaintiff's assertions in the response to the motion to dismiss are construed as clarifying Plaintiff's claim "that staff at FCCC have violated Plaintiff's right to due process by acting arbitrarily and capriciously to impose standards of conduct or possession of property without prior notice," then Defendant is still entitled to summary judgment because respondent superior is not a basis for relief in § 1983 actions. Doc. 43 at 14. Defendant contends that the Secretary of DCF

"cannot be held liable for the actions of FCCC staff, who are employed by GEO, without any evidence that the Department took part in the alleged deprivations." *Id.*

"It is well established that liability in § 1983 cases cannot be premised solely upon a theory of respondeat superior." Bryant v. Jones, 575 F.3d 1281, 1299-1300 (11th Cir. 2009), *citing* Crawford v. Carroll, 529 F.3d 961, 978 (11th Cir. 2008); Braddy v. Florida Dep't of Labor & Employment Security, 133 F.3d 797, 801 (11th Cir. 1998); *see also* Monell v. Dep't of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); Polk County v. Dodson, 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981). The Eleventh Circuit Court of Appeals explained that a claim based on "supervisory liability" is permissible only in limited situations:

> Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. . . (Citations omitted). The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. . . (Citations omitted). The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.

Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990); *see also* Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003); Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003).

In this case, there is no causal connection between the Defendant and Plaintiff's examples showing how individual staff at FCCC act in an arbitrary manner. The actions of staff were not taken by following the directive or policy of the Defendant; rather, the opposite is true at times. For example, an assertion that FCCC staff did not uphold a

Handbook policy permitting a resident to "speak and express oneself in writing" (doc. 48 at 19) is not attributable to the Defendant and there is no causal connection. Furthermore, when officials fail to honor a policy that legal mail is not to be read during a random search (doc. 48 at 16-17), those officials are not acting pursuant to policy but against it, and there is no causal connection to the Defendant.

Plaintiff's submission of evidence, along with his arguments, are deemed to be efforts to show a widespread history of abuse such that Defendant was on notice of the need to correct the alleged deprivations. While such a showing may support a claim premised on supervisory liability, that showing has not been made here. Considering the facts presented in Plaintiff's affidavits in the light most favorable to Plaintiff, that evidence demonstrates only isolated occurrences of instances where FCCC officials acted on their own and not in accordance with policy or procedure. There were four occurrences in 2010, two in 2011, and four incidents in 2012. Those limited events cannot amount to flagrant, rampant or continued problems sufficient to support the "widespread abuse" standard.

Moreover, even if this evidence were weighed in Plaintiff's favor and found to be more than isolated instances, there is no evidence that the Defendant "had actual or constructive notice of" the violations. Goebert v. Lee Cnty., 510 F.3d 1312, 1332 (11th Cir. 2007) (explaining that "supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations."), citing West v. Tillman, 496 F.3d 1321, 1329 (11th Cir. 2007) (other citations omitted). "Unless a policymaker knows of the need [to remedy an

unconstitutional condition], no liability can arise from failure [to do so]." <u>Marsh v. Butler</u> <u>Cnty., Ala.</u>, 268 F.3d 1014 1037 (11th Cir. 2001). "As the Supreme Court has stated, 'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.' " <u>Bd. of County</u> <u>Comm'rs v. Brown</u>, 520 U.S. 397, 410, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997), *quoted in* <u>Honors, Jr. v. Judd</u>, No. 8:10cv22, 2010 WL 3467264, at *4 (M.D. Fla. Aug. 31, 2010). Because there is no evidence that the Secretary of DCF had any awareness that FCCC staff were not complying with policies or procedures published for the residents by FCCC, Defendant is entitled to summary judgment.

Notwithstanding the recommendation that summary judgment should be granted because there is no causal connection with the Defendant, it is worth noting that Defendant has demonstrated Plaintiff has been provided due process as required by the Fourteenth Amendment. Although it is undisputed that rules for FCCC have not been promulgated under Florida's Administrative Procedure Act (chapter 120, Florida Statutes), there are rules which are published and provided to the residents such that they may know what is expected, permitted, and punishable. The Handbook provides guidelines as to resident behavior, outlines the "privilege levels," identifies contraband items, and provides "a list of rule violations with the range of sanctions for each offense, and a list of approved property." (Budz Affidavit, doc. 43-1, Ex. A). Thus, residents have prior notice, or fair warning, of proscribed conduct and Plaintiff's due process claim must fail. Accordingly, Plaintiff's request to find the Jimmy Ryce Act (FLA. STAT. § 394.910 through § 394.931) unconstitutional because of the lack of promulgated rules must be denied.

In light of the recommendation to grant Defendant's motion for summary judgment, doc. 43, Plaintiff's motion for a temporary restraining order and a preliminary injunction, doc. 49, must be denied. Preliminary injunctive relief may be granted only if the moving party establishes:

(1) a substantial likelihood of success on the merits;

(2) a substantial threat of irreparable injury unless the injunction issues;

(3) the threatened injury to the movant outweighs whatever harm the proposed injunction may cause the opposing party; and

(4) granting the injunction would not be adverse to the public interest.

Keeton v. Anderson–Wiley, 664 F.3d 865, 868 (11th Cir. 2011). Because Plaintiff's claim must fail on the merits, the motion, doc. 49, must be denied.

In light of the foregoing, it is respectfully **RECOMMENDED** that Plaintiff's motion for temporary restraining order and a preliminary injunction, doc. 49, be **DENIED**, that Defendant's motion for summary judgment, doc. 43, be **GRANTED**, and judgment entered accordingly.

**IN CHAMBERS** at Tallahassee, Florida, on August 1, 2013.

 S/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**